56 Cal.App.4th 801 (1997)
In re JOSHUA M., a Person Coming Under the Juvenile Court Law.
SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent,
v.
JENNIFER M., Defendant and Appellant.
Docket No. H015979.
Court of Appeals of California, Sixth District.
July 22, 1997.
*803 COUNSEL
Christine Cleary, under appointment by the Court of Appeal, for Defendant and Appellant.
Steven M. Woodside, County Counsel, and Susan S. Ware, Deputy County Counsel, for Plaintiff and Respondent.
Catherine Campbell, under appointment by the Court of Appeal, for Minor.
OPINION
BAMATTRE-MANOUKIAN, J.
The mother in this dependency proceeding appeals from orders terminating both parents' parental rights. She argues that the father's attorney was ineffective in his representation and that she was prejudiced thereby. We reject these claims and affirm the orders.

BACKGROUND
Joshua M. was born December 19, 1992, to Jennifer M., an unmarried teenage mother. He was small at birth and gained weight very slowly during his first year of life, prompting concerns whether he was getting sufficient nourishment. A referral was made to the department of family and children's services (the Department) in April of 1993 and several months thereafter Joshua and his mother began receiving voluntary services from the Department.
The social worker assigned to assist Joshua and his mother found the mother's care to be "unsatisfactory." The mother had difficulty maintaining a regular feeding schedule and feeding Joshua nutritionally appropriate foods. She would become angry and resentful when she had to attend to her child's needs. Joshua was often ill during his first year, with colds, infections, vomiting and intestinal problems. Furthermore, the mother was unable to provide a stable home environment, moving repeatedly before settling *804 down in the home of Inez T., the mother of one of her friends, shortly before Joshua's first birthday.
On December 27, 1993, the Department filed a petition on Joshua's behalf, under Welfare and Institutions Code section 300, subdivision (b)[1] (failure to protect and to provide regular care). Various reports indicated that Joshua was undersized and developmentally delayed. Although the mother had shown some positive changes since moving in with Inez T., the social worker was concerned that the mother did not show good judgment, often left her child alone, was found to possess marijuana, and one time took her child to Mexico without sufficient provisions for him.
The petition, as amended, alleged that the services provided since April of 1993 were not effective, that the child was diagnosed as medically fragile, with a failure to thrive, that the mother's parenting had been erratic, that she often responded to the child's needs with anger and resentment, that the minor was not being appropriately nourished and that the mother was not cooperating with the public health nurse and medical personnel. The petition did not mention the father except to state that his address was "Avenal State Prison."
The petition was sustained March 15, 1994, and Joshua was permitted to remain with his mother so long as the mother continued to reside in the home of Inez T. Family maintenance services were ordered for the mother. Blood tests were ordered to determine the paternity of the alleged father, Thomas M. Thomas M. had been transported from prison and was present at the jurisdictional hearing with his attorney.
On March 29, 1994, only two weeks later, a supplemental petition was filed alleging that the family maintenance plan had not been effective in protecting Joshua. The mother had removed him from the home, in violation of the court's orders, and at a time when he was suffering from diarrhea and scabies, causing a great risk of harm to his physical health. Further, the mother left Joshua in the care of a 16-year-old babysitter, with no instructions for his care, and failed to return for more than 24 hours, without letting anyone know of her whereabouts. The supplemental petition, as amended, further alleged that the mother suffered from multiple mental disabilities which prevented her from adequately caring for her child. Joshua was detained on March 31, 1994, and was placed in protective custody at an emergency shelter.
On August 4, 1994, the supplemental petition was sustained after a brief trial and the court ordered that Joshua be continued in protective custody. *805 Reunification services were ordered for the mother, in the form of a parenting program, psychological therapy, an evaluation for medication, and vocational training. Visitation was ordered for two hours a week. In the same proceedings, the court found that Thomas was Joshua's father and an interim hearing was set for 90 days to consider reunification services for him.
At the interim hearing November 1, 1994, the social worker submitted a report documenting her efforts to determine what services were available to the father in prison. She reported the father's release date would be prolonged because of disciplinary action and that he would be transferred to another facility. There were no parenting classes or other appropriate services available at the prison, although the father was attending school and vocational classes. Because the prison was not located in the community where Joshua lived, the social worker felt that visits would be very difficult to arrange and would not be in Joshua's best interest. She recommended that the father incur no further disciplinary action in prison and that upon his release he complete a parenting class, obtain suitable housing and have supervised visitation twice a week. These recommendations were adopted by the court.
While in prison the father wrote to the social worker requesting that Joshua be placed with his mother. The social worker responded by initiating a home study of the paternal grandmother's home in Los Banos.
At the six-month review hearing on March 1, 1995, it was reported that Joshua's growth was still slow. A nasogastric tube was inserted for nighttime feedings to raise his caloric intake. He was moved to a temporary foster home where the foster mother was a nurse. The social worker reported that she received a positive report regarding the paternal grandmother's home. However, the report recommended that the grandmother visit Joshua a few times before any decision was made. The social worker tried to arrange this but the grandmother declined several attempts by the social worker to arrange visits with Joshua. The social worker concluded that the grandmother was not very interested in taking Joshua into her home. The social worker continued to search for suitable placement for Joshua. She speculated, however, that perhaps "due to Joshua's special needs that not many foster parents are willing to take the challenge."
Meanwhile, the father had been moved to Mule Creek prison. As to the mother, she had moved again and was difficult to get in touch with. She visited with Joshua, but her attendance was poor and concerns were expressed about the quality of the visits. She had not enrolled in any court ordered programs by the end of 1994. In sum, there had been only "minimal *806 compliance" with the case plan. The court continued reunification orders for both parents and set a 12-month review for July 26, 1995.
The father was released from prison in April of 1995. In May of 1995, a foster home was located for Joshua, where the foster parents were willing to take care of Joshua's special needs and also to transport him to Clover House for visits with his parents. Placement was approved, over the mother's objection, and Joshua was placed on June 15, 1995.
The 12-month hearing, originally set for July 26, 1995, was held September 29, 1995. The social worker recommended that services be terminated. Neither party had complied in any significant way with the reunification plans. The mother had not followed through with any classes and had missed 23 of 37 scheduled visits. Since his release, the father had been living with his mother in Los Banos. He had contacted the social worker and she had discussed the reunification plan with him. Out of a total of 14 visits, which were set up for him at Clover House in May, June and July, he failed to show up for 10 of these. He was referred to a local parenting class, but reported that he would rather participate in a program in the community where he was living with his mother. There is no indication in the record that he did so. By the time the hearing was held, 16 months had elapsed from the time Joshua was detained on the supplemental petition. The social worker did not believe there was any substantial probability for either parent to reunify with Joshua within the next two months. The court terminated services and set a section 366.26 hearing for January 17, 1996.
The father could not be located for service of the notice of the section 366.26 hearing. The hearing was continued and he was eventually located in the Merced County jail on February 28, 1996. The hearing was continued again until he could be transported. A contested section 366.26 hearing eventually commenced on June 5, 1996. The father was present with counsel.
The social worker reported that Joshua, who was now three and a half years old, was thriving in the home of his foster parents, where he had been placed for a year. He was eating and gaining weight. He appeared to be "happy and secure" in his new home and was bonding with his foster parents. They were willing and able to take care of his special needs and were firmly committed to adopting him. In the social worker's opinion, Joshua's biological mother and father had not built a significant relationship with Joshua. Both the mother and father testified at the trial, which concluded on August 16, 1996. The court then terminated the rights of both parents and freed Joshua for adoption. The mother has appealed.

*807 DISCUSSION
The mother argues that her fundamental rights were violated throughout these proceedings because counsel representing the father was ineffective. She argues specifically that counsel failed to ensure that reasonable services were provided to the father while he was incarcerated, that the Department did not give proper consideration to placement of Joshua with the paternal grandmother, that counsel failed to request that the dependency be dismissed upon the father's release from prison and that counsel failed to file a writ petition challenging the termination of services to the father. Anticipating the argument that she has no standing to raise these claims, the mother contends she has standing because there is a unity of interest between her and the father and because she was prejudiced by counsel's errors.
We denied the Department's motion to dismiss the appeal for lack of standing. The mother is a proper appellant. She has standing to appeal. We determined that the question whether she has standing to raise certain issues was more properly addressed in a decision on the merits. Having reviewed the record in this case, we are inclined to agree with the Department that the mother cannot raise a claim that separate counsel for the father was ineffective. In any event, the record in this case does not demonstrate ineffective assistance of counsel. We therefore affirm the orders terminating parental rights.

Ineffective Assistance of Counsel
(1) The mother argues that she was directly affected by the alleged ineffective assistance of the father's counsel because of their "unity of interest." (In re James S. (1991) 227 Cal. App.3d 930, 932, fn. 6 [278 Cal. Rptr. 295].) She claims that in the absence of the alleged errors of counsel, the father's parental rights would not have been terminated. Under section 366.26 and rule 1463(a) of the California Rules of Court, she argues, parental rights of one parent cannot be terminated unless parental rights of both are terminated. Therefore, if the decision to terminate the father's rights was based on reversible error, she was directly injured thereby.
There are several flaws in this argument. Only the mother has appealed. We are unaware of any authority for the proposition that one parent can claim ineffective assistance of the other parent's counsel when the other parent has not appealed. Indeed, the general rule is that "`[a]n appellant cannot urge errors which affect only another party who does not appeal.'" (In re Gary P. (1995) 40 Cal. App.4th 875, 877 [46 Cal. Rptr.2d 929]; In re Jasmine J. (1996) 46 Cal. App.4th 1802, 1806 [54 Cal. Rptr.2d 560]; In re Vanessa Z. (1994) 23 Cal. App.4th 258, 261 [28 Cal. Rptr.2d 313].)
*808 Rule 1463(a) of the California Rules of Court does not help appellant. That rule, which is analogous to a compulsory joinder provision, simply provides that a court terminating parental rights in a section 366.26 proceeding must terminate the rights of both parents in one proceeding. (See In re Marilyn H. (1993) 5 Cal.4th 295 [19 Cal. Rptr.2d 544, 851 P.2d 826].) This is in contrast to the former statutory scheme, where the rights of each parent could be terminated in separate proceedings, and it promotes the public policy favoring adoption as the preferred permanent plan.
Furthermore, this case is entirely distinguishable from the James S. case. In James S., both parties appealed. The issue of ineffective assistance of one party's counsel had been raised at the trial level. Both parties had briefed and argued it and a Marsden hearing had been held. (People v. Marsden (1970) 2 Cal.3d 118 [84 Cal. Rptr. 156, 465 P.2d 44.) Here the father has never complained about the ineffective assistance of his counsel and the issue was never raised below. Unlike the parents in James S., the interests of the mother and father in this case were divergent, rather than united. They had never been married and had never lived together. There was no plan of reuniting as a family after the father was released from prison. In fact the mother had a new partner, with whom she had a new child. At the section 366.26 hearing, the parents were not in agreement about a plan for Joshua. The mother advocated long-term foster care and the father wanted guardianship, with the paternal grandmother appointed Joshua's guardian.
(2) Even if we were to accept the premise that one parent can raise claims as to the ineffective assistance of another parent's counsel, which we do not, the record before us does not support appellant's claims. In order to succeed with such claims, an appellant must show that counsel was incompetent and that it is reasonably probable that a more favorable result would have been reached in the absence of the alleged errors. (In re Kristin H. (1996) 46 Cal. App.4th 1635, 1668 [54 Cal. Rptr.2d 722].) Neither prong of this test is demonstrated here.
Appellant argues first that counsel was ineffective in failing to secure reunification services for father, particularly visitation, while he was in prison. This claim, which should have been raised, if at all, in a timely writ petition under California Rules of Court, rule 39.1B (§ 366.26, subd. (k)), is without merit. The father was incarcerated in a prison outside the community where Joshua lived. Joshua was a medically fragile child. The social worker determined that visitation with the father in prison was not in Joshua's best interests. The father had no relationship with Joshua. He had never been a custodial parent and was not seeking custody at disposition. All of these circumstances distinguish this case from those cited by appellant. (See, e.g., *809 In re Brittany S. (1993) 17 Cal. App.4th 1399 [22 Cal. Rptr.2d 50]; In re Monica C. (1995) 31 Cal. App.4th 296 [36 Cal. Rptr.2d 910]; In re Precious J. (1996) 42 Cal. App.4th 1463 [50 Cal. Rptr.2d 385]; Robin V. v. Superior Court (1995) 33 Cal. App.4th 1158 [39 Cal. Rptr.2d 743].) Visitation with the father in prison was not mandated or indicated here. (Robert L. v. Superior Court (1996) 45 Cal. App.4th 619, 628 [53 Cal. Rptr.2d 41]; In re Terry H. (1994) 27 Cal. App.4th 1847, 1854 [34 Cal. Rptr.2d 271].)
Appellant argues further that the father's attorney was remiss in failing to ensure he had visitation with Joshua once he was released from prison. However, the record shows that 14 visits were arranged between the father and Joshua during the 2 months following the father's release. The father missed 10 out of the 14. There is no indication his lack of attendance was in any way attributable to his attorney.
Appellant argues that the father's attorney was ineffective in not ensuring that more consideration was given to placing Joshua with his paternal grandmother, citing section 361.3, which indicates a legislative preference for placement with relatives. Again, this is a matter which must be raised, if at all, by the father in a writ proceeding after the 12-month hearing. Appellant herself did not even support such a placement. Moreover, the record shows that although the placement report on the grandmother's home was positive, the grandmother was unwilling to visit with Joshua, as requested several times by the social worker, and thereafter failed to return the social worker's calls. The social worker therefore concluded that the grandmother did not show sufficient interest in having Joshua placed with her, particularly considering that he was a special needs child. Under the circumstances, the failure to place Joshua with the paternal relatives was supported by the record and in no way reflects on counsel's competence.
Appellant's next claim of incompetence of the father's counsel is that counsel did not request the placement of Joshua with the father after the father's release from prison. There is no basis in the record for such a request. The father had never had custody of Joshua and demonstrated no understanding of the child's special needs. Although the father wrote the social worker from prison, indicating a desire to become part of his son's life, he failed to follow through on reunification. Furthermore, the father did not want placement with himself, but with his mother.
Finally, appellant argues that counsel's "most egregious" error was in failing to file a writ petition after the 12-month hearing. She argues that there were "significant appealable issues" at this time. As the preceding discussion indicates, we disagree with appellant. The father received services consistent with his situation and his relationship with the child. The *810 court's findings of reasonable services at both the six-month and twelve-month hearings were supported by the evidence. The father's lack of interest after he was released from prison is fully documented. Aside from three visits with his son, he did not comply with any aspect of reunification. He had a criminal history and indeed reverted to a life of crime within a short time after his release. "[W]here ... the record clearly indicates that the reunification services were adequate, counsel is not obligated to file a petition for writ of mandate." (Cresse S. v. Superior Court (1996) 50 Cal. App.4th 947, 956 [58 Cal. Rptr.2d 56].) On this record, we conclude counsel was not ineffective in not filing a writ petition on behalf of the father.

DISPOSITION
The orders of the juvenile court terminating parental rights are affirmed.
Cottle, P.J., concurred.
PREMO, J., Concurring.
I agree with the majority's disposition in this case. However, I would affirm the judgment on the basis of the mother's lack of standing to raise arguments on behalf of the minor's father. The father chose not to appeal in this case. He was represented by independent appointed counsel. Whether that counsel functioned in a competent manner is a question that must be raised, if at all, by the father.
The majority agree with this point and the opinion more than adequately demonstrates the reasons why the mother does not enjoy a so-called "unity of interest." The majority opinion should not therefore include a discussion of the mother's appellate points relating to the father's participation in the case. Besides being pure dictum, such a discussion in the opinion dignifies the arguments raised in this appeal which in my opinion are completely specious.
NOTES
[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.