Filed 2/4/15  In re A.J. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re A. J. et al.,<br><br>Persons Coming Under the Juvenile Court Law. | B254942<br>(Los Angeles County<br> Super. Ct. No. DK02685) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MAYRA M.-C.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Julie F. Blackshaw, Judge.  Affirmed.

Darlene Azevedo Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Tracey F. Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

**INTRODUCTION**

Mayra M.-C. ("Mother") appeals from the juvenile court's jurisdictional order adjudging her four children dependents of the court and its dispositional order removing them from her custody. Essentially, the juvenile court concluded that Mother's substance abuse and mental health issues created a substantial risk that her children would be harmed. We conclude that substantial evidence supports both of the trial court's orders and therefore affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Mother has four children: A., Kevin, George and Aliyah.[1] K. J. is the father of A. and Kevin and George M. is the father of the two youngest children, George and Aliyah. Mother and George M. are married. Neither father is a party to this appeal.[2]

The section 300 petition,[3] filed by Department[4] in December 2013, relied upon two separate subdivision (b) "failure to protect" allegations to assert jurisdiction.

---

[1]     The children were born: A., September 2005; Kevin, October 2007; George, July 2009; and Aliyah, November 2010.

[2]     K. J. did not participate in the juvenile court proceedings. The trial court found that K. J. had been given the notice required by law. In her opening brief, Mother argues that finding "is not supported by the evidence and compels reversal." Mother has no standing to raise this claim. "[T]he general rule is that '"[a]n appellant cannot urge errors which affect only another party who does not appeal."' [Citations.]" (*In re Joshua M.* (1997) 56 Cal.App.4th 801, 807.) Because K. J. is not a party to this appeal, we do not discuss the issue.

[3]     All statutory references are to the Welfare and Institutions Code.

[4]     The Los Angeles County Department of Children and Family Services.

The first allegation was that Mother "has a history of substance abuse, including methamphetamine, and is a daily abuser of marijuana, which renders [her] incapable of providing regular care for the children. On prior occasions in 2013, [she] possessed, used and was under the influence of marijuana while the children were in [her] care and supervision. On 10/15/2013, [she] had a positive toxicology screen for marijuana. . . . [Her] substance abuse . . . endangers [their] physical health and safety, and places [them] at risk of physical harm, damage, danger."

The second allegation was that Mother "has a history of mental and emotional problems including, suicidal ideation and a suicide attempt, which renders [her] incapable of providing regular care and supervision of the children. In June of 2013, [she] attempted suicide by ingesting an excessive amount of medication pills, and was hospitalized for the evaluation and treatment of [her] psychiatric condition. [She] has failed to obtain necessary mental health treatment. . . . Such mental and emotional condition on [her] part . . . endangers the children's physical health and safety, and places [them] at risk of physical harm, damage, danger."

At the combined jurisdictional-dispositional hearing conducted in February 2014, Department submitted, without any objection from Mother, the detention report and the "jurisdiction disposition report." The evidence in those reports, viewed in the light most favorable to the juvenile court's orders (*In re S.O.* (2002) 103 Cal.App.4th 453, 461), established the following.

George M., the father of George and Aliyah, contacted Department and stated that on Wednesday, October 9, 2013,[5] he had been in Mother's home and that there were "maggots in the kitchen sink, dirty clothes s[c]attered throughout

5        All subsequent dates refer to 2013 unless stated otherwise.

3

the living quarters[,] spoiled food in the refrigerator and the children appeared to be in need of a bath." That day, social worker Bridget Johnson responded by visiting first A.'s school and then the family home.

At the school, staff told Johnson that A., who was then eight years old, "was not at school this week" and that she "was performing below grade level and . . . that the communication between [Mother] and staff was limited."

Johnson then went to the family home, a triplex unit. Mother's parents and aunt live in the front units while Mother and her children live in the back home. Mother came out of the back home. Johnson asked Mother for permission to enter her home but Mother declined. Johnson told her about the allegations. Mother became irate, claiming the allegations were false. She yelled: "Leave us alone" and "He [George M. is] fucking lying on me." Johnson explained the need for Department to investigate the allegations to assess whether the children's safety and welfare were jeopardized. Mother became irate, yelling and crying, and again refused Johnson access to her home. Mother's aunt, Norma R. approached. Mother began to cry. She instructed Norma R. to tell Johnson "that my children live in the front house[,] not the back house." Norma R. hesitated but then said that the children lived "mainly in the front wit[h] [Mother's] parents."

Johnson attempted to have a conversation with Mother about George M. Mother's speech "became unclear." She slurred her words and dragged her sentences for a long time. She was unable to follow the conversation or to answer the questions coherently. Johnson believed "[t]here were obvious signs of memory impairment" and that Mother's behavior and statements "indicated obvious signs of mental illness." Mother denied any mental health issues. She claimed that George M. had called Department because he "just wanted to see her unhappy."

Johnson asked Mother if she was under the influence of drugs. First, Mother said "no" but then recanted and said that she smoked marijuana "from time to time

4

but denied any other illicit drug." Johnson believed that drugs were one reason Mother could not answer her (Johnson's) questions. Johnson asked Mother if she took any other drugs in addition to marijuana. Mother responded by changing topics. Johnson asked Mother to take a drug test that day but Mother declined.

Norma R. stated that she and Mother's parents "help [M]other with the children on a daily basis" and that "the children are 'always with family' even if [M]other is not around."

Johnson spoke with two of Mother's children. Eight-year-old A. stated that she did "not like sleeping in the back [home]" with Mother. Six-year-old Kevin said that Mother and George M. lived in the back house and that the home was "dirty."

After Johnson left the home, she received a call from George M. He explained that he had contacted Department because he was concerned about his children's "well being and safety in the care of [M]other" and that he had sought Department's assistance because Mother "would not allow him to take the children." When Johnson told him that Mother had denied her access to the home, George M. responded that Mother had done so because "the condition[s] were deplorable."

The next day (October 10), Mother agreed to submit to a drug test but failed to complete it once she went to the testing center. George M. telephoned Johnson and told her that he believed that Mother had declined the test because she was under the influence of methamphetamine. On October 15, Mother did take a drug test and tested positive for marijuana.

On October 28, Johnson met with Mother to tell her the result of the drug test. Mother stated she was "not surprise[d]" because she "smokes at least five

5

marijuana blunts a day."[6]  Mother explained that while she has a medical marijuana card, she does "not have any medical conditions."  Instead, "she smokes marijuana daily to calm her down."

On November 21, Johnson met again with Mother at Mother's home. Mother quickly became irate, yelling vulgarities.  Johnson asked about her mental health history.  Mother said she had received mental health services when she was a child but denied receiving services at the present time.  Mother yelled "I don't need any fucking mental health services" and stated that she was not crazy. Mother agreed to participate in a Team Decision Making (TDM) meeting to address mental health issues.  But when Johnson asked for permission to enter the back house to assess its condition, Mother declined.

On December 10, the TDM meeting was conducted which included, among others, George M. and several social workers.  Mother presented as lethargic, made inappropriate comments, and needed to be redirected to stay on topic.  Mother, who was then 27 years old, admitted that she had smoked marijuana since she was 14 years old.  When asked why she had a medicinal marijuana card, Mother replied:  "[S]o that I can smoke weed and not get arrested."  She explained that she had told the prescribing physician that "she needed the marijuana for complications related to menstruation" but that she smokes it to "calm [herself] down" from the stress caused by George M.  Mother also admitted to using methamphetamine. When asked the last time she had used that drug, Mother replied:  "It's been a while," "sometime in the beginning of the year."  George M. agreed that Mother had last used it in January.  Mother explained that "she did not believe that she had

---

[6]     Department, citing urbandictionary.com, provides the following definition of a blunt:  "Cigar hollowed out and filled with marijuana, can be smoked in public (somewhat) inconspicuously."

an issue with drugs." She asserted that she had stopped using methamphetamine without treatment and she could do the same for her use of marijuana.

When the meeting turned to the issue of Mother's mental health, Mother denied any issues in that regard and, in particular, denied ever having been hospitalized. George M. contradicted Mother. He explained that six months earlier, Mother had been hospitalized after she attempted to commit suicide by taking an overdose of pills after he had taken custody of the children. At that point, Mother conceded the suicide attempt but blamed it on stress caused by George M.

In regard to Mother's living situation, George M. explained that she lived in the back house of the triplex and that "on several occasions," he had "found it dirty[,] [s]pecifically he [saw] dirty dishes in the sink with maggots, the home without food and the home disorganized."

In this December meeting, Mother agreed to the removal of all four children from her care, to participate in a drug treatment program (including random testing), to receive a psychiatric evaluation, and to participate in individual therapy. George and Aliyah were placed with George M. and A. and Kevin were placed with a maternal aunt. A social worker interviewed six-year-old Kevin and asked him, among other things, whether he had ever seen Mother smoke. Kevin replied: "She smokes blunts. . . . They are brown and white" and then Kevin acted out what it looked like when Mother smoked marijuana.

In a February 10, 2014 interview with a social worker, Mother continued to deny her problems, asserting that George M. had "made these allegations up . . . because he's mad that I cheated on him." Mother claimed that she had used marijuana to take away "bad menstrual pain"; that she had smoked only "two blunts every day" "while the kids are at school"; and that she had "stopped smoking weed since this DCFS case started." Mother denied ever having used

methamphetamine. When confronted with the fact that two months earlier at the TDM meeting she had admitted using methamphetamine—an admission with which George M. had agreed—Mother replied: "No, that's not true, [the social worker] wrote extra stuff in the report because we didn't along. . . . The Social Worker put that in the report because she is more on his [George M.'s] side than she is mine. She was trying to help him and no[t] me." But then Mother conceded: "I tried meth one time when I was 14. That was it. I didn't like it so I switched to weed and stayed on it a long time."

As for her mental health, Mother stated she had tried to commit suicide because George M. had taken her children and would not let her see them. She did not remember the type of pills she had taken, stating only that "they were old" and had "never been opened." She denied having been hospitalized, claiming: "I went to Centinela Hospital and they let me go the same day. They told me to get some rest and go home. . . . They didn't diagnose me with anything." Since then, Mother has not received any mental health services.

In regard to the claim that she lived "in a dirty house," Mother said: "It was nothing wrong with the house. I was not staying back there. The back house was the garage. . . . Me and George used to live back there but when we separated I moved into the house with my mom."

In a February 2014 interview with a social worker, Norma M., Mother's aunt, confirmed that Mother has been "using marijuana since she was 14." Norma R. has seen Mother smoke marijuana while her children were in the front house with her (Norma R.) or Mother's mother. Norma R. said that Mother attempted suicide because she and George M. had "got into an argument and he took the kids." According to Norma R., Mother had lived in the back house "for a few months," "[s]ometimes [it] was dirty and sometimes it was clean."

8

Following a contested joint jurisdictional-dispositional hearing, the trial court ruled:

"Regarding the drug use, the court is well aware of the case law requiring both abuse and a nexus to the children. And the court does find that both exist in this case.

"The mother's use of methamphetamine – she said in one interview, it hasn't been since she was 14, then in another one, then there is contrary evidence that she had used it last year. The mother is lying about her drug use, and those lies certainly create an inference that the drug use is much more prevalent than the mother states. And the need to lie about the drug use does suggest that this, in fact, is drug abuse. Because if there wasn't drug abuse, there would be no need to be lying about it and trying to hide the information.

"And, in fact, abuse is also defined by the inability to maintain normal daily functions of life. And the dirty home is a very good example of that. And contrary to counsel's argument that, you know, this is sort of a garden variety dirty home, in fact homes with maggots, soiled foods go way beyond what is expected of a normal home that might get dirty on occasion.

"And the incident – the fact that it was in this condition as recently as October does continue to pose a continual risk, particularly since there's no evidence or reason to believe that the issue has at all been addressed.

"The fact that the children have been absent from school is also part of the evidence supporting the fact. And this is the context that gets put together of the various components. Maybe one individual absence of a child might not lead one to suspect the parent is on drugs, but given the context of all of the evidence in this case, it certainly does add additional evidence to support the fact that this – that there is a drug problem here.

"In terms of the attempted suicide, there does – in fact, an attempted suicide actually does put the children quite greatly at risk, because it is not healthy for children to have parents that harm themselves and ultimately could lead to children without a parent.

9

"And so the court does not dismiss that as just a one-time unserious event.  That is a very serious event.  This, combined with the mother's apparent incoherence at interviews, as well as the mood swings, does provide enough evidence for the court to sustain the mental health counts, as well."

The juvenile court turned to disposition of the matter.  Mother asked that the children be returned to her custody on the condition that they live either in the front house with her relatives or with George M.  The trial judge replied:  "I realize [that] Mother wants to keep her children with her.  However, a home of parent mother order conditioned on the fact that the children don't spend any time at [Mother's] home unfortunately does not make any sense.  So the court is not going to order that."  The court found by clear and convincing evidence that returning the children to Mother's custody would create a substantial danger to their physical health, safety, protection, or emotional well being; that there was no reasonable means by which they could be protected without removing them from her custody; and that reasonable efforts had been made to prevent and eliminate the need for removal.  The court ordered George and Aliyah placed with their father George M. and A. and Kevin placed in Department's care for suitable placement.  Mother was ordered to participate in a drug/alcohol program that included testing, mental health counseling, parenting classes, and individual counseling.

This appeal by Mother follows.

**DISCUSSION**

1. *Substantial Evidence Supports the Jurisdictional Finding Based on Mother's Substance Abuse*

Section 300, subdivision (b), allows a child to be adjudged a dependent of the juvenile court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's . . . mental illness . . . or substance abuse."

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re James C.* (2002) 104 Cal.App.4th 470, 482.) Using this standard, we review the record in the light most favorable to the trial court's decision, drawing all reasonable inferences from the evidence to support its findings. We do not reweigh the evidence, re-determine credibility or exercise independent judgment. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Here, substantial evidence supports the trial court's finding that Mother's substance abuse put her four children, ages 3 to 8, at risk. Mother conceded that she had smoked marijuana since she was 14 years old; that she smoked it at least five times a day; and that she had obtained a medical marijuana card under false pretenses in order to buy the drug. Kevin, Mother's six-year-old son, had seen her smoke marijuana and Norma R., Mother's aunt, confirmed that Mother smoked the drug while her children were in the front house. In addition, Mother admitted that she had used methamphetamine. This record flatly contradicts Mother's appellate suggestion that she engaged only in the medical use of marijuana. Accordingly, there is no need to discuss *In re Alexis E.* (2009) 171 Cal.App.4th 438, 452-453 which holds that medicinal use of marijuana, without more, cannot support a jurisdictional finding.

11

Anticipating this conclusion, Mother urges that this record contains "no evidence" that her substance abuse created "a specific, defined risk of harm to [her] children." The argument misses the mark. "Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child [citation]. The court may consider past events in deciding whether a child presently needs the court's protection. [Citation.] A parent's "'[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' [Citation.]" (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215-1216.) In addition, the Legislature has declared: "The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2.)

Here, Mother has consistently smoked marijuana for 13 years—a use her oldest son had witnessed—and conceded having used methamphetamine. Her dissembling, if not outright false, answers to questions about her drug use created the reasonable inference that her use of illegal drugs was greater than she acknowledged. Her children were young, ranging from 3 to 8 years old, and thus required consistent supervision and care. But Mother had failed to provide that required care as manifested by the filthy state of her home, A.'s absence from school, and A.'s preference not to live in the back house, a residence that both Mother's son and aunt described as "dirty." Taken together, the juvenile court could reasonably infer from these facts that Mother's on-going substance abuse manifested such poor judgment and lack of parenting skills that there was a substantial risk that her four children would suffer serious physical harm or illness. Mother's contrary arguments—arguments made to and rejected by the trial court—

12

are nothing more than requests that we reweigh the evidence or re-determine credibility. We cannot do so. (*In re I.J., supra,* 56 Cal.4th at p. 773.)

2. *Substantial Evidence Supports the Jurisdictional Finding Based on Mother's Mental Health Issues*

In June 2013, Mother attempted to commit suicide after George M. took custody of her children. Mother was not candid with Department about her effort to kill herself. Initially she denied it and then tried to minimize it by shifting blame to George M. as its precipitating cause. After the suicide attempt, Mother did not receive any mental health services.

In addition, Mother's interactions with Department were further evidence of her mental illness. Mother's emotionally volatile behavior with Johnson on October 9 was, to Johnson, indicative of mental illness. When, at a November 21 meeting, Johnson asked Mother about mental health issues, Mother again responded in a loud and vulgar manner. And at the December 10 TDM meeting, Mother presented an inappropriate affect.

This record constitutes substantial evidence that Mother has serious mental health problems but is in denial of those problems. This conclusion, in turn, supports the reasonable inference that Mother is incapable of providing regular care to her children and is therefore creating a substantial risk that her children will be harmed. The juvenile court properly asserted jurisdiction on this basis.[7]

---

[7] Mother urges that "[t]his is a custody dispute, nothing more [between] parents [Mother and George M. who] were in a contentious relationship and . . . apparently could not work out a satisfactory resolution" so that this situation "does not warrant juvenile court jurisdiction." Our conclusion that substantial evidence supports both jurisdictional orders disposes of this claim.

3. *Substantial Evidence Supports the Juvenile Court's Dispositional Order*

The juvenile court may not remove a child "from the physical custody of his or her parent" unless there is clear and convincing evidence that there is "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) A decision to remove a child requires a determination that reasonable efforts were made to prevent or eliminate the need for removal. (§ 361, subd. (d).) We review the juvenile court's findings for substantial evidence.[8] (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426.)

In this case, Mother has significant substance abuse and mental health problems but denied the existence of both problems and the need for treatment. In the November 21 meeting with Johnson, Mother said: "I don't need any fucking mental health services." At the December 10 TDM meeting, Mother said she did not have "an issue with drugs" and could cease smoking marijuana with receiving any treatment. And in February 2014, two months after she had relinquished custody of her children to George M. and an aunt and had agreed to receive counseling for substance abuse and mental health issues, Mother continued to deny that she had any problems. This record supports Department's conclusion, set forth in the "jurisdiction/disposition report," that Mother did "not understand the

---

[8] Although the burden of proof at the dispositional phase is clear and convincing evidence (§ 361, subd. (c)), we, nonetheless, review the dispositional order for substantial evidence. "'The "clear and convincing" standard . . . is for the edification and guidance of the trial court and not a standard for appellate review. [Citations.] "'The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal.'"' [Citations.]" (*In re Christopher R., supra,* 225 Cal.App.4th at p. 1216, fn. 4.)

risk to the children if these issues are not addressed and treated appropriately." In addition, Mother had rejected Johnson's requests, made on two separate occasions, that she enter Mother's home to assess its condition. Based upon all of these facts, the trial court could reasonably conclude that leaving the children in Mother's custody created a substantial danger to her four children's health and safety; that there were no reasonable means to protect the children without removing them from her custody; and that reasonable efforts had been made to eliminate the need for a removal. "A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.] *The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute [§ 361, subd. (c)(1)] is on averting harm to the child.*" (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, italics added.)

To support a contrary conclusion, Mother urges that it was not necessary to remove the children from her custody to ensure their safety because the trial court could have, instead, directed that the children live with other relatives. The trial court considered and rejected that option. As explained in the preceding paragraph, substantial evidence supports the removal order. We therefore reject Mother's request to reweigh the evidence and reach a contrary result. (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.)

Lastly, we reject Mother's claim that the trial court committed prejudicial error because it failed to identify the facts upon which it based its finding that there were no reasonable means to protect the children absent removing them from Mother's custody. Subdivision (d) of section 361 provides, in relevant part: "The court shall state the facts on which the decision to remove the minor is based." Here, the juvenile court expressly found that reasonable efforts had been made to prevent or eliminate the need for removal. "Although the court did not state a

factual basis for its removal order, any error is harmless because it is not reasonably probable such findings, if made, would have been in favor of continued parental custody.  [Citation.]"  (*In re Diamond H., supra,* 82 Cal.App.4th at p. 1137.)

## DISPOSITION

The orders appealed from are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.

COLLINS, J.

16