Filed 8/25/22 (unmodified opn. attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | B314532<br>(Los Angeles County<br>Super. Ct. No. 19CCJP04863) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>JOSE G.,<br><br>　　Defendant and Appellant. | ORDER MODIFYING OPINION<br>(NO CHANGE IN JUDGMENT) |

THE COURT:

The opinion filed August 23, 2022, is modified as follows:

1.  On page 27, the heading for Discussion, part B is modified to read as follows: "**DCFS Violated Mother's Right to Due Process by Failing to Afford Her Proper Notice of the Proceedings**"; and

2.  The first sentence of footnote 26 on page 29 is modified to read as follows: "Although the juvenile court's ruling that mother was given proper notice of the section 366.26 hearing is the only finding that is subject to this appeal (see Discussion, part E, *post*), we also consider whether DCFS provided mother with proper notice of prior hearings because that issue is relevant to our analysis of whether: (1) father has standing to maintain this appeal; and (2) DCFS's violation of mother's right to due process was prejudicial."

There is no change in judgment.

_____

ROTHSCHILD, P. J.          CHANEY, J.          BENDIX, J.

Filed 8/23/22 (unmodified opinion)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | B314532 (Los Angeles County Super. Ct. No. 19CCJP04863) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JOSE G., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Terry T. Truong, Temporary Judge. Conditionally reversed and remanded with instructions.

Carol A. Koenig, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

Father appeals from the juvenile court's order terminating his and mother's parental rights and finding that the child, J.R., was adoptable. We conditionally reverse that order because the Los Angeles County Department of Children and Family Services (DCFS or the agency) violated mother's due process rights.

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." (U.S. Const., 14th Amend., § 1.) Except in emergent circumstances, this provision guarantees reasonable notice and a meaningful opportunity to be heard before the state may deprive a person of a protected liberty or property interest. (See *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 212, 214; *Gilbert v. Homar* (1997) 520 U.S. 924, 930–931.) Because parents have a fundamental liberty interest in the companionship, care, custody, and management of their children, the due process clause requires child welfare agencies to exercise reasonable diligence in attempting to locate and notify them of dependency proceedings. (See *In re DeJohn B.* (2000) 84 Cal.App.4th 100, 106 (*DeJohn B.*); *In re Mia M.* (2022) 75 Cal.App.5th 792, 807 (*Mia M.*).) This is no idle command. It requires a thorough and systematic investigation to protect a parent's fundamental liberty interest. (*Mia M.*, at p. 808.)

2

This case presents a textbook example of a due process violation. DCFS initiated dependency proceedings concerning J.R. on the ground that his father physically abused him. Even though father told the agency at the outset of the proceedings that mother resided in El Salvador, the record does not show that DCFS made any attempt to ascertain mother's location in that country. Instead, DCFS undertook a search of federal records and databases concerning California residents, and it later purported to serve mother with notice through publication in a Los Angeles-based newspaper. Further, after mother (a) contacted DCFS on the telephone, (b) disclosed to the agency her cellular telephone number and her address in El Salvador, and (c) provided J.R.'s birth certificate upon receiving a request through social media for that document, DCFS did not use any of that contact information to afford mother proper notice of the proceedings. The agency's failure to do so deprived her of an opportunity to persuade the juvenile court not to terminate her parental rights.

Father appeals the order terminating both parents' parental rights.[1] Father's appeal is predicated solely on DCFS's infringement of mother's right to proper notice. DCFS's principal defenses are that father lacks standing to raise mother's notice claims and any error on its part was harmless.

We conclude that father has standing to assert DCFS's violation of mother's due process rights. Under the unique circumstances of this case, we exercise our broad remedial discretion to reverse the order terminating *both* parents' rights based on this due process claim, thereby conferring standing on

---

[1] Mother is not a party to this appeal.

3

father to maintain this appeal.  First, father's appeal is the only practicable means by which the agency's contravention of mother's due process rights can be remedied.  Second, affording mother proper notice and a reasonable opportunity to be heard (a) allows mother to seek reunification with her son, and (b) promotes participation of all relevant parties, thus providing the juvenile court with a full picture of the relevant facts.  Third, allowing J.R.'s interest in permanency and stability to bar father from raising mother's constitutional claim would turn the dependency scheme on its head by rewarding DCFS's failure to provide mother with any meaningful opportunity to protect her rights.  In sum, we conclude that granting father standing to raise mother's due process claim by conditionally reversing the termination order as to both parents effectuates the underlying purposes of the juvenile dependency scheme.

Reaching the merits of the due process claim, we conclude the agency's violation of mother's right to due process was not harmless beyond a reasonable doubt.  Furthermore, the child's interest in permanency and stability counsels in favor of a conditional reversal of the termination order as to both parents to avoid any undue delay in his permanent placement.  Upon remand, DCFS shall exercise reasonable diligence to locate and properly serve mother.  If mother does not appear within a reasonable period of time, then the juvenile court shall reinstate the termination order as to both parents.

**FACTUAL AND PROCEDURAL BACKGROUND**

We summarize only those facts pertinent to our disposition of this appeal.

1. ***The dependency petition, the detention report, the detention hearing, and the first amended petition***

On August 1, 2019, DCFS filed a juvenile dependency petition concerning J.R., who was then eight years old. In the petition, DCFS alleged jurisdiction was proper under Welfare and Institutions Code[2] section 300, subdivisions (a) and (b)(1) because father had physically abused the child.

Accompanying the petition was a detention report.[3] Father told the agency that he and J.R. migrated from El Salvador to the United States in August 2018. Father claimed mother lived in El Salvador, and further claimed father raised the child as a single parent because mother abandoned J.R. when he was one and a half years old. On the first page of the detention report, DCFS listed mother's address as "[w]hereabouts unknown in El Salvador."

On August 2, 2019, the juvenile court held a detention hearing. At the hearing, the court asked father whether he had mother's contact information. Father replied, "I don't. She left us when [J.R.] was a little boy, and we haven't heard from her." The juvenile court thereafter detained J.R. from his parents.

---

[2] Undesignated statutory citations are to the Welfare and Institutions Code.

[3] The remainder of this paragraph summarizes pertinent aspects of the detention report.

5

On August 28, 2019, DCFS filed a first amended petition, which added jurisdictional allegations against mother pursuant to section 300, subdivisions (b)(1) and (g). DCFS averred that mother, whose "whereabouts [were] unknown," had "failed to provide the necessities of life for [J.R.], including food, clothing, shelter and medical care."

2. ***The jurisdiction/disposition report and hearing***

On August 29, 2019, DCFS filed a jurisdiction/disposition report. The report represents that DCFS personnel initiated a due diligence search for mother, but that the "search did not locate the whereabouts of the mother due to the limited information the father [had] provided." Attached to the report is a declaration of due diligence concerning that search. Although some of the abbreviations and terms utilized in the declaration of due diligence are not clearly defined, the declaration does show that the agency limited its search to only federal government databases (e.g., federal prison records) and databases of information concerning persons located in California (e.g., records from the Los Angeles County Registrar of Voters and the county jail).

On September 10, 2019, the juvenile court held a combined jurisdiction and disposition hearing. The court sustained the jurisdictional allegations included in the first amended petition, declared J.R. a dependent of the court, removed J.R. from the custody of his parents, and ordered DCFS to provide family reunification services to father. Pursuant to section 361.5, subdivision (b)(1), the court ordered DCFS not to provide

6

reunification services to mother.[4]  The court ordered the agency to allow mother to have monitored visits with J.R. "upon the mother contacting DCFS first."

### 3.    *The section 366.21, subdivision (e) and the section 366.21, subdivision (f) status review hearings*

On March 10, 2020, the juvenile court held a status review hearing pursuant to section 366.21, subdivision (e).  The court found that returning J.R. to father's physical custody would create a substantial risk of detriment to the child, father's progress toward alleviating or mitigating the causes necessitating placement had been substantial, and DCFS had offered reasonable services to enable the child's safe return home. The court ordered the agency to continue to provide reunification services to father.

A status review hearing pursuant to section 366.21, subdivision (f) was held on September 16, 2020.  J.R.'s counsel told the court that, "through some means that [counsel was] not completely sure of," J.R.'s foster caregiver found mother in Honduras, and the caregiver "has spoken to the mother as had" J.R.  The attorney remarked that it was "baffling to [her] that DCFS [had] not called the mother and gotten any information from" her.

After J.R.'s counsel made these representations, the juvenile court ordered DCFS to "follow up in contacting mother to

---

[4]  Section 361.5, subdivision (b)(1) provides in pertinent part:  "Reunification services need not be provided to a parent or guardian . . . when the court finds, by clear and convincing evidence, . . . [¶] . . . [t]hat the whereabouts of the parent or guardian are unknown."  (§ 361.5, subd. (b)(1).)

7

get her thoughts and impression of this case and whether she has anything else to offer at her residence in Honduras." Additionally, the court once again found that returning J.R. to father's physical custody would create a substantial risk of detriment to him, father's progress toward alleviating or mitigating the causes necessitating placement had been substantial, and DCFS had offered reasonable services to enable J.R.'s safe return to father's custody. The court ordered DCFS to continue to provide father with reunification services.

4. ***DCFS's September 18, 2020 telephone conversation with mother, and the foster caregiver's sister's contact with mother via social media***

On October 20, 2020, DCFS filed a last minute information report, wherein the agency stated that it received a telephone call from mother on September 18, 2020. Because of the significance of this telephone conversation to the instant case, we recount much of this report's description of the call: "On 9/18/20, [a DCFS social worker] received a What's App telephone call from mother . . . . Mother[ ] reported that she was currently 'stuck in Guatemala for about a year now after she went searching for her son, [J.R.] Mother reported that she has not been able to go back to her home Country of El Salvador due to the worldwide pandemic. Mother reported that she raised her son up until three years ago when father forced her to sign his passport application. Mother reported that father told her that he was going to Guatemala for work and needed [J.R.] and her to go with him. After he forced her to sign the passport application she was kidnapped by local gangsters. Mother reported that she was about to be shot and killed but her neighbors had contacted the police and they saved her life. Mother never returned to her

8

home as the people that kidnapped her were local gang members that father was friends with.  Mother reported that she believes that father paid the gang members to have her killed. . . .  Mother reported that she has been searching for her son and wants him returned to her. . . .  [¶]  Mother sells cell phones in El Salvador.  Mother denied any history of mental health or medical issues.  Mother reported that [J.R.] was not of school age when she was caring for him . . . ."[5]

A last minute information report that DCFS filed on January 26, 2021 indicates that at an unspecified point in time, J.R.'s foster caregiver gave the agency J.R.'s birth certificate, a copy of which is included in the record.[6]  On January 25, 2021, a social worker asked the foster caregiver how she had obtained the birth certificate.  The caregiver responded that "her sister, who[ ] resides in . . . El Salvador, was able to contact mother . . . through social media," and that mother provided the birth certificate to the caregiver's sister.  The caregiver "reported that she [had] not had any further contact with her sister or [J.R.'s] mother . . . regarding [the] child's case."

---

[5] The agency's "delivered service log" includes an entry pertaining to the September 18, 2020 call, which shows mother supplied the social worker with mother's cellular telephone number and her "family home address" in El Salvador.  The remainder of the log entry is comprised of essentially the same information that is included in the October 20, 2020 last minute information report.  Neither the last minute information report nor the delivered service log entry discloses how mother acquired the social worker's telephone number or why J.R.'s counsel apparently believed mother was in Honduras.

[6] The remainder of this paragraph summarizes relevant aspects of this last minute information report.

**5.** *The section 366.22 status review hearing*

On February 25, 2021, the juvenile court held a status review hearing pursuant to section 366.22. The court found that returning J.R. to father's physical custody would create a substantial risk of detriment to the child, and that DCFS had offered reasonable services to enable J.R.'s safe return home. Further, the court terminated father's reunification services on the ground that although father was "in substantial compliance" with the case plan, he had "failed to establish that it [was] in the best interests of the minor" for father to continue to receive reunification services. The court stated that J.R. was not comfortable having visits with father because of "the significant trauma that [J.R.] suffered at father's hands," and that it was "unrealistic to expect [J.R. would] be in a different position" if the reunification period were further extended.

Upon terminating father's reunification services, the court scheduled a section 366.26 hearing for June 23, 2021. The certificate of mailing accompanying the minute order for the hearing shows that the court clerk did not mail the "Notice of Entry of the above minute order of February 25, 2021 and Notice of Intent to File Writ, Petition for Extraordinary Writ form(s)" to mother because her whereabouts were "unknown" to the court.[7] (Some boldface & some capitalization omitted.)

---

[7] The juvenile court is required to notify the parties that " 'direct appellate consideration of the propriety of the [order] setting [a section 366.26 hearing] may be had only by petition for extraordinary writ review of the order.' [Citation.]" (See *In re Serenity S.* (2020) 55 Cal.App.5th 355, 370 (*Serenity S.*).)

### 6. *DCFS's efforts to locate and serve mother in advance of the section 366.26 hearing*

On March 11, 2021, the juvenile court ordered DCFS to provide mother with notice of the section 366.26 hearing via publication in the Daily Commerce & Pace News, a Los Angeles-based newspaper of general circulation in California. DCFS's request for the publication order was supported by a declaration of due diligence. The declaration shows the agency conducted a search of the same databases it had reviewed in connection with the declaration of due diligence submitted in advance of the jurisdiction/disposition hearing, and that these new "search efforts were [also] unsuccessful in locating" mother. On May 20, 2021 and June 4, 2021, DCFS filed reports for the upcoming section 366.26 hearing, wherein the agency asserted it had served mother by publishing notice of the hearing in the Daily Commerce & Pace News on March 23, 2021, March 30, 2021, April 6, 2021, and April 13, 2021.

### 7. *Father's section 388 petition, the section 366.26 hearing, and father's notice of appeal*

On June 23, 2021, the juvenile court found that notice of the section 366.26 hearing was proper, and continued the hearing to August 25, 2021 to allow DCFS to assist J.R.'s foster caregiver in securing copies of her divorce decrees.[8] Although the court initially stated that no further notices were necessary, it later ordered DCFS to "send courtesy notice to father for the next

---

[8] In one of the reports DCFS prepared in connection with the section 366.26 hearing, the agency indicated that the foster caregiver needed to obtain these documents in order to be considered a prospective adoptive parent for J.R.

date." Additionally, the court scheduled a permanency planning review hearing for January 3, 2022.

On August 23, 2021, father filed a petition pursuant to section 388 in which he asked the court to set aside the February 25, 2021 order terminating his family reunification services. Father asserted he was entitled to this relief because he had been "enrolled in individual therapy for over two months and . . . gained further insight into why [he had] a case" in dependency court.

The section 366.26 hearing resumed on August 25, 2021. The juvenile court denied father's section 388 petition on the grounds that it did not state new evidence or a change of circumstances, and that the relief sought was "not in the child's best interest." Next, the court terminated the parental rights of mother, father, and "anyone else that claims to be a parent" to J.R., found that J.R. was adoptable, and designated J.R.'s foster caregiver as his prospective adoptive parent. The court found that January 3, 2022 was "[t]he likely date by which the agency [would] finalize the adoption." The certificate of mailing accompanying the minute order for this hearing indicates that the "Notice of Entry of the above minute order of August 25, 2021 and Appeal Rights form(s)" were not mailed to mother because her "whereabouts [were] unknown" to the court. (Boldface omitted.) Later that day, father appealed the findings and orders issued on June 23, 2021 and August 25, 2021.

8. ***The proceedings following the section 366.26 hearing***

The juvenile court ultimately continued the permanency planning review hearing from January 3, 2022 to December 27, 2022. As a result, J.R. has not yet been adopted

12

and the juvenile court still has jurisdiction over the dependency proceedings.[9]

## DISCUSSION

**A.** **We Deny DCFS's Motion to Dismiss This Appeal Because Father's Appeal Was Timely, He Has Standing, and We Exercise Our Discretion to Reach the Merits in Spite of DCFS's Other Defenses**

DCFS moves to dismiss the appeal, arguing: (1) father failed timely to appeal the juvenile court's finding that notice was proper; (2) father lacks standing to argue that DCFS failed to provide mother with adequate notice of the proceedings; and (3) the forfeiture, waiver, invited error, unclean hands, and disentitlement doctrines bar father from maintaining this appeal. As discussed in greater detail below, we conclude that father's appeal is timely and that he has standing to maintain this appeal, and we exercise our discretion to reach the merits notwithstanding DCFS's invocation of the forfeiture, waiver, invited error, unclean hands, and disentitlement doctrines. Consequently, we deny DCFS's motion.[10]

---

[9] We, sua sponte, take judicial notice of the juvenile court's docket and the January 3, 2022, January 26, 2022, and June 21, 2022 minute orders that continued the permanency planning review hearing to December 27, 2022. (See Evid. Code, §§ 452, subds. (c)–(d), 459.)

[10] In its motion to dismiss, DCFS also contends that father may not secure reversal of the juvenile court's jurisdictional and dispositional orders because he did not timely appeal them. Although we agree with DCFS on this point (see Discussion,

13

### 1. *Father timely appealed the juvenile court's finding that notice of the section 366.26 hearing was proper*

DCFS points out that "[a]t the initial section 366.26 hearing for [J.R.] on June 23, 2021," the juvenile court found that " 'notice [was] proper for the [366].26 hearing' " and " '[n]o further notices [were] necessary.' " DCFS argues father cannot challenge that finding because he filed the notice of appeal on August 25, 2021, which is more than 60 days after June 23, 2021. (See Cal. Rules of Court, rule 8.406(a)(1) ["[A] notice of appeal must be filed within 60 days after the rendition of the judgment or the making of the order being appealed."].)[11]

" 'A judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment.' [Citations.] As a result of these broad statutory terms, '[j]uvenile dependency law does not abide by the normal prohibition against interlocutory appeals . . . .' [Citations.]" (*In re S.B.* (2009) 46 Cal.4th 529, 531–532 (*S.B.*).) Notwithstanding this exemption from the bar against interlocutory appeals, " 'one does not appeal from a finding; one appeals from a judgment or from an order that the Legislature has designated as appealable.'

_____

part E, *post*), we find that this procedural issue concerns the proper scope of father's appeal from the order terminating parental rights rather than a ground for dismissing the appeal. (See *Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018 (*Sara M.*) ["An appeal from the most recent order in a dependency matter may not challenge earlier orders for which the time for filing an appeal has passed."].)

[11] Undesignated rule citations are to the California Rules of Court.

14

[Citation.] . . . [R]eview of findings is normally obtained by appeal from the *ensuing judgment or order*."[12]

In this context, the appealability of an order depends on whether it "substantially affected" the interests of a party, i.e., the order rendered him or her an "aggrieve[d]" party. (See *S.B.*, *supra*, 46 Cal.4th at pp. 534, 537.) In *S.B.* for instance, the high court deemed appealable an "order [to] search for an adoptive family" that was issued pursuant to section 366.26. (See *S.B.*, at p. 531 & fn. 1.) The *S.B.* court reasoned that although this order did not terminate parental rights, it nonetheless "substantially affected" "[t]he interests of parents and children" because the order had the effect of "limit[ing] the permanency planning options to adoption or guardianship" and " 'eliminat[ing] the option of long-term foster care . . . .' [Citation.]" (See *id.* at pp. 533–537.) Relying on this reasoning, our Supreme Court rejected Court of Appeal decisions "holding that appeals by parents from [these] orders were premature" because they were "mere continuances of section 366.26 hearings . . . ." (See *S.B.*, at p. 534.)

At the conclusion of the June 23, 2021 hearing in this case, the juvenile court continued the section 366.26 hearing to August 25, 2021. It was at that second hearing that the court

---

[12] (See *S.B.*, *supra*, 46 Cal.4th at p. 534, italics added, citing, *inter alia*, Code Civ. Proc., § 906 ["[T]he reviewing court may review . . . *any intermediate ruling, proceeding, order or decision* which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party . . . . The provisions of this section do not authorize the reviewing court to review any decision or order from which an appeal might have been taken," italics added].)

15

terminated father's and mother's parental rights pursuant to section 366.26. Before the juvenile court issued the termination order on August 25, 2021, father could not have sought appellate review of the finding that notice of the section 366.26 hearing was proper because, unlike the order at issue in *S.B.*, the June 23, 2021 continuance order did not substantially affect the parent-child relationship. In fact, the continuance order delayed the legal injury that father claims resulted from the finding of proper notice, to wit, the extinguishment of parental rights. Therefore, we consider the August 25, 2021 order terminating father's rights to be the "ensuing . . . order" from which father may seek review of the notice finding (see *S.B.*, *supra*, 46 Cal.4th at p. 534; Code Civ. Proc., § 906), and we reject DCFS's assertion that his appeal is untimely. A contrary holding would compel parties to a dependency case to file multiple potentially unnecessary protective appeals, thereby consuming scarce judicial resources. (See *City of Gardena v. Rikuo Corp.* (2011) 192 Cal.App.4th 595, 599 [observing that " ' "piecemeal disposition and multiple appeals in a single action [can] be oppressive and costly" ' "].)

2. *Father has standing to argue that DCFS failed to provide mother with proper notice of the proceedings*

"[T]he general rule is that ' "[a]n appellant cannot urge errors which affect only another party who does not appeal." ' [Citations.]" (*In re Joshua M.* (1997) 56 Cal.App.4th 801, 807 (*Joshua M.*).) A corollary to this general rule is the principle that, " '[w]here the interests of two parties interweave, either party has standing to litigate issues that have a[n] impact upon the related interests.' " (See *In re Caitlin B.* (2000) 78 Cal.App.4th 1190, 1193.) Consequently, whether father has

16

standing to assert alleged violations of mother's right to notice of the dependency proceedings depends on whether mother and father have "intertwined interests . . . ." (See *ibid.*)

Father argues that if he establishes that DCFS failed to provide mother with proper notice, then the order terminating parental rights should be reversed as to both parents. In essence, father contends that both parents' interests are intertwined because, under the facts of this case, the reversal of the order terminating mother's parental rights would justify reversal of the order terminating his rights.

As we explain in greater detail below, conditionally reversing the order terminating *both* parents' rights based on a violation of mother's right to due process falls within our broad statutory discretion to fashion appropriate appellate relief. We further conclude that conditional reinstatement of both parents' rights would be appropriate here because this constitutional violation would otherwise probably go uncured, thereby thwarting the dependency system's objectives of family reunification and ensuring that the disposition of a dependency petition is based on all material facts and circumstances. Because the fate of mother's and father's respective parental rights thus depends upon whether mother's due process claim is meritorious, their interests are "intertwined," meaning that father has standing to raise mother's due process challenge.

Code of Civil Procedure section 43 provides that a reviewing court "*may* affirm, reverse, or modify any judgment or order appealed from, and *may* direct the *proper* judgment or order to be entered, or direct a new trial of further proceedings to be had." (Code Civ. Proc., § 43, italics added.) Code of Civil Procedure section 906 employs nearly identical language to

17

define the powers of a reviewing court.  (Code Civ. Proc., § 906.)
These provisions thus confer broad discretion in formulating an
appellate disposition.[13]

*DeJohn B.* demonstrates that an appellate court's
expansive authority to fashion appellate relief includes the
discretion to reinstate the rights of one parent based on an error
in the termination of the rights of another parent.  There, a
mother appealed the termination of her parental rights, arguing
that the relevant child welfare agency failed to "even attempt to
notify her of the six-month review hearing where the court
terminated reunification services and scheduled a permanency
hearing."  (See *DeJohn B.*, *supra*, 84 Cal.App.4th at p. 102.)  The
father appealed that order as well, even though he otherwise
"[had] *no independent* challenge . . . ."  (See *ibid.*, italics added.)
Instead, he "argue[d] his parental rights [had to] be reinstated if
[the] mother prevail[ed]."  (See *ibid*.)

The Court of Appeal agreed with the mother and reversed
the order terminating her rights.  (See *DeJohn B.*, *supra*,
84 Cal.App.4th at p. 102.)  Although the *DeJohn B.* court
recognized that reversal of an order terminating rights of a

---

**13**  (See *Crane v. Dolihite* (2021) 70 Cal.App.5th 772, 792–
793 [indicating that Code Civ. Proc., §§ 43's & 906's use of the
term "may" demonstrates that they grant "discretionary
authority" to reviewing courts]; *Davis v. County of Fresno* (2018)
22 Cal.App.5th 1122, 1140 [holding that these two statutes
delineate the "discretionary authority of [a] reviewing court in
formulating relief"]; Eisenberg et al., Cal. Practice Guide:  Civil
Appeals and Writs (The Rutter Group 2019) ¶ 11:48, p. 11–17
["The courts of appeal and the supreme court are given broad
powers in the disposition of appeals," citing Code Civ. Proc.,
§ 43].)

parent based on a claim of error belonging solely to another parent was "not automatic," the court exercised its discretion to reinstate father's parental rights.  (See *id.* at p. 110.)  The Court of Appeal "perceive[d] no legitimate purpose to be served by leaving [the children] without a father and whatever legal benefits or entitlements that may come to them through the paternal side of the biological family."  (See *ibid.*)  The court explained that since it was "reinstating [the] mother's rights pending further proceedings[,] . . . . [t]he children [were] once again in limbo, and no one kn[ew] at th[at] time whether they w[ould] be adopted or permanently returned to their mother."  (See *ibid.*)  The Court of Appeal summarized the rationale for its appellate disposition as follows:  "In short, it is in the minors' best interests to reinstate father's parental rights."  (*Ibid.*)

Although *DeJohn B.* did not address whether, and if so under what circumstances, a parent has standing to raise an appellate claim belonging to another parent, the decision illustrates the breadth of an appellate court's remedial authority. In essence, the *DeJohn B.* court exercised its discretion to reinstate the father's rights, notwithstanding the absence of any error as to him, because doing so achieved one of the fundamental objectives of the juvenile dependency scheme—i.e., protecting the best interests of the minor.  (See *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1424 (*Luke M.*) ["[T]he underlying purpose of dependency law is to protect the welfare and best interests of the dependent child."]; see also *In re Mary G.* (2007) 151 Cal.App.4th 184, 192, 208, 212 (*Mary G.*) [citing *DeJohn B.* for the proposition that an appellate court may reinstate both parents' rights if doing so is in the child's best interest,

19

notwithstanding the "absen[ce of] any independent error pertaining to" one of the parents].)

Turning to the instant case, if we did not employ our remedial authority to, in effect, grant father standing to raise DCFS's violation of mother's right to notice, then this constitutional error would most likely go uncorrected. Mother would not be able to file her own appeal of the August 25, 2021 order terminating her parental rights because the 60-day jurisdictional deadline for doing so has long since passed.[14] Even assuming arguendo that this procedural barrier would not preclude mother from seeking relief via a habeas petition,[15] mother lacks a meaningful opportunity to pursue that remedy. When a DCFS social worker last spoke with mother, she was in either El Salvador or Guatemala, and there is no indication that the agency ever notified her of the nature of the proceedings or any of her rights relating thereto. (See Discussion, parts B–C, *post*.) Expecting mother to inform herself of her legal rights and to file a successful habeas petition thereafter would be unreasonable and a hollow remedy for a violation of her due process rights.

---

[14] (See rule 8.406(a)(1); *In re A.R.* (2021) 11 Cal.5th 234, 246 (*A.R.*) [characterizing rule 8.406(a)(1)'s 60-day deadline as "a jurisdictional deadline, meaning that courts lack the power to extend it"].)

[15] (Cf. *A.R., supra*, 11 Cal.5th at pp. 243, 255–256 & fns. 5 & 6 [holding that "[w]hen an attorney fails to file a timely appeal [of an order terminating parental rights] in accordance with a client's instructions, the parent may seek [habeas] relief based on the attorney's failure to provide competent representation"].)

Furthermore, remedying this due process violation by reversing the order terminating parental rights affords mother an opportunity to seek a new jurisdictional and dispositional hearing on the ground that DCFS failed to exercise due diligence in attempting to locate her and notify her of that proceeding.[16] This remedy serves the minor's best interests: " '[I]t is implicit in the juvenile dependency statutes that it is always in the best interests of a minor to have a dependency adjudication based upon all material facts and circumstances and the participation of all interested parties entitled to notice.' [Citation.] The right to counsel and participation not only protects the parent's interests but also ensures that the juvenile court has the fullest picture of the relevant facts before disposing of a dependency petition." (*In re Christopher L.* (2022) 12 Cal.5th 1063, 1076 (*Christopher L.*).) It follows that exercising our broad discretion to reverse the order terminating both parents' rights serves an underlying purpose of the dependency scheme, i.e., protecting the best interests of the child. (See *Luke M.*, *supra*, 107 Cal.App.4th at p. 1424.)

We acknowledge that J.R. has a countervailing interest in "a stable and permanent placement in a family unit . . . ." (See *DeJohn B.*, *supra*, 84 Cal.App.4th at p. 109.) Nevertheless, "[w]e must evaluate that right in the context of mother's compelling interest as a parent and her due process right to be notified of the proceedings." (*Ibid.*) We are concerned with the

---

[16] (See Discussion, part B, *post* [explaining that DCFS failed to exercise reasonable diligence in attempting to locate mother prior to the jurisdictional/dispositional hearing]; Discussion, part C, *post* [noting that mother may challenge prior rulings for lack of proper notice].)

21

" 'depriv[ation] . . . of that "most basic of civil rights"—the [parent's] care, custody, and companionship of' " her child. (See *id.* at pp. 109–110.) Furthermore, we conclude that DCFS's search efforts in this case "are unreasonably lacking, and that [its] failure to notify [mother] l[ed] to a prejudicial delay in participation." (See *Mia M.*, *supra*, 75 Cal.App.5th at p. 811; Discussion, parts B–C, *post*.) Under these circumstances, allowing J.R.'s interest in a permanent placement to "act as a counterbalance to the agency's due diligence obligations would turn one of the key goals of the dependency statutory scheme on its head, reducing the chance of family reunification while simultaneously rewarding inadequate efforts to notify parents." (See *Mia M.*, at p. 811.) The juvenile dependency scheme recognizes that promoting family reunification may sometimes delay implementing a stable and permanent home for a child within its jurisdiction.[17] Additionally, because a conditional reversal of the order terminating mother's and father's rights allows the juvenile court to reissue the termination order if mother fails to appear after receiving proper notice (see Discussion, part D, *post*; Disposition, *post*), our decision to confer standing upon father will not result in an undue delay of J.R.'s permanent placement.

We reject DCFS's argument that the *Joshua M.* decision establishes that father lacks standing to raise mother's claims of error. In *Joshua M.*, after the juvenile court terminated a

_____

**17** (See, e.g., *In re D.N.* (2020) 56 Cal.App.5th 741, 762 (*D.N.*) ["[U]nder unusual and rare circumstances, 'the statutory and constitutional interests of the parent and child in reunification if possible prevail[ ] . . . over' [statutory] limits [on reunification services]."].)

mother's and a father's respective parental rights, the mother appealed the decision, asserting that the father's attorney rendered ineffective assistance of counsel. (See *Joshua M.*, *supra*, 56 Cal.App.4th at p. 803.) In particular, the mother argued that the father's "counsel failed to ensure that reasonable services were provided to the father while he was incarcerated, that the [child welfare agency] did not give proper consideration to the placement of [the child] with the paternal grandmother, that counsel failed to request that the dependency be dismissed upon the father's release from prison and that counsel failed to file a writ petition challenging the termination of services to the father." (See *id.* at p. 807.) In rejecting the mother's contention that she could assert father's claim of ineffective assistance of counsel, the Court of Appeal found that "the father [had] never complained about the ineffective assistance of his counsel and the issue was never raised below." (See *id.* at pp. 807–808.)

In contrast to the case before us, the father in *Joshua M.* was represented by counsel and participated in the underlying dependency proceedings (see, e.g., *Joshua M.*, *supra*, 56 Cal.App.4th at p. 806 [noting that the father attended the section 366.26 hearing with his attorney]). Here, mother never appeared, either personally or through counsel. Further, although the mother in *Joshua M.* claimed that the father's attorney should have filed a writ petition after the 12-month hearing, she did not claim that the father was unaware of, or otherwise unable to, exercise his right to appeal the subsequent order terminating his parental rights.[18] (See *Joshua M.*, at

---

[18] Indeed, the Court of Appeal observed that "the father's lack of interest" in the case was "fully documented" because,

23

pp. 809–810.)  It thus seems that the father in that case had an opportunity to—but did not—raise the ineffective assistance claim at issue (e.g., by filing a notice of appeal and joining in mother's arguments).  In further contrast, mother here expressed an interest in reuniting with J.R., but DCFS failed to afford her an opportunity to participate in the proceedings.  Accordingly, reversal of the entirety of the termination order is necessary to safeguard a parent's fundamental rights in the instant case; the same was not true in *Joshua M.*

We observe that conditional reinstatement of father's parental rights is significant appellate relief for him, notwithstanding the fact this disposition does not automatically entitle him to reunify with J.R.[19]  There are potential circumstances in which father would benefit if mother appeared after the matter is remanded.  For instance, if mother ultimately obtains custody of J.R., father may ask the court to allow him to

---

"[a]side from three visits with his son, he did not comply with any aspect of [the] reunification" plan.  (See *Joshua M.*, *supra*, 56 Cal.App.4th at pp. 809–810.)

[19]  Because father did not file a notice of intent to file a writ petition contesting the prior order terminating his reunification services and setting a section 366.26 hearing, he cannot challenge that order in this appeal.  (See *Serenity S.*, *supra*, 55 Cal.App.5th at p. 370 ["[O]rdinarily, . . . 'direct appellate consideration of the propriety of the setting order may be had only by petition for extraordinary writ review of the order.' "]; rule 8.450(e)(1) ["A party seeking writ review . . . must file in the superior court a notice of intent to file a writ petition."].)

24

visit J.R.[20]  On the other hand, if termination of father's parental rights were not conditionally reversed, then this option would be unavailable to him.[21]

Lastly, our decision to allow father to seek reinstatement of both parents' rights on account of an error in the termination of mother's rights is consistent with the approach undertaken by rule 5.725(a), a provision the Judicial Council has adopted to implement the purposes of the dependency scheme.[22]  The provision states that as a general rule, "[t]he court may not terminate the rights of only one parent under section 366.26 . . . ."  (See rule 5.725(a).)  The rationale is that "[t]he purpose of termination of parental rights is to free the child for adoption," and "[t]he rights of all parents—whether natural,

---

[20]  (See § 361.2, subds. (a) & (b)(1) ["If the court places the child with [a] parent [with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of section 300], the court may do any of the following: [¶] . . . Order that the parent become legal and physical custodian of the child.  The court may also provide reasonable visitation by the noncustodial parent."].)

[21]  (See § 366.26, subd. (i)(1) ["Any order of the court permanently terminating parental rights under this section shall be conclusive and binding upon the child[ and] upon the parent or parents . . . .  After making the order, the juvenile court shall have no power to set aside, change, or modify it."].)

[22]  (See rule 5.501(b) ["[The juvenile court rules] implement the purposes of the juvenile court law . . . ."]; rule 5.501(c)(2) ["Insofar as these rules may add to existing statutory provisions relating to the same subject matter, these rules must be construed so as to implement the purposes of the juvenile court law."].)

presumed, biological, alleged, or unknown—must be terminated in order to" achieve that objective.  (See rule 5.725(f).)  Because we have found that freeing J.R. for adoption at this time is not appropriate, rule 5.725(a) counsels in favor of affording J.R. the potential benefits from having two parents.  (See *DeJohn B.*, *supra*, 84 Cal.App.4th at p. 110 [indicating that former rule 1463 was consistent with the appellate court's decision to reinstate both parents' rights based on the mother's due process claim]; *Mary G.*, *supra*, 151 Cal.App.4th at p. 208 [stating that former rule 1463 is now rule 5.725].)

In sum, we hold that father has standing to maintain this appeal because, under the unique facts of this case, DCFS's failure to afford mother with constitutionally adequate notice of the proceedings warrants the reversal of the order terminating *both* parents' rights.

### 3. *We elect to reach the merits of father's appeal, notwithstanding DCFS's other defenses*

DCFS argues that because "father never objected to any alleged notice issues as to mother" during the proceedings below, his appellate claims are "forfeited and waived and/or the error[s were] invited."  DCFS further maintains that we should dismiss father's appeal pursuant to the unclean hands and disentitlement doctrines because he allegedly "prevented DCFS from locating mother by providing an inaccurate name [citation], show[ed] a pattern of refusing to attend meetings for [J.R.], such as school IEP and MAT assessments," and threatened J.R.'s foster caregiver.

As we explain in Discussion, part B, *post*, whether DCFS discharged its constitutional obligation to serve mother properly with notice of the dependency proceedings is a pure question of

26

law. Furthermore, the public's interest in the due administration of justice weighs in favor of adjudicating this claim of error because mother lacks any meaningful opportunity to present this claim on her own. (See Discussion, part A.2, *ante*.) Accordingly, we exercise our discretion to reach the merits of this appellate claim.[23]

## B. DCFS Violated Mother's Right to Due Process y Failing to Afford Her Proper Notice of the Proceedings

As a preliminary matter, we observe that neither party has identified the standard of review applicable to father's claim that DCFS violated mother's due process rights by failing to provide

---

[23] (See *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767 [holding that application of the waiver doctrine is a matter committed to the court's discretion]; *In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 298, fn. 2 ["[A]pplication of the forfeiture rule 'is not automatic.' [Citation.] When an appellant raises a question of law, for example, the appellate court can exercise its discretion to address the issue.' "]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2019) ¶ 8:248.13, p. 8–185 ["Application of the doctrine of invited error is *not automatic*; it is *discretionary* with the appellate court."]; *Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 446–447 ["The defense of unclean hands . . . applies only where it would be inequitable to grant the [litigant] *any* relief. [Citations.] . . . The decision of whether to apply the defense based on the facts is a matter within the . . . court's discretion."]; *In re A.K.* (2016) 246 Cal.App.4th 281, 285 [" 'Appellate disentitlement "is not a jurisdictional doctrine, but a discretionary tool that may be applied when the balance of the equitable concerns make it a proper sanction." ' "].)

her with adequate notice of the dependency proceedings.[24] Because the parties do not dispute the facts concerning this due process claim, the instant alleged constitutional error presents a purely legal question that is subject to de novo review. (See *Mia M.*, *supra*, 75 Cal.App.5th at p. 806 ["[We] consider de novo whether inadequate notice violated [a parent's] due process rights."]; *Shewry v. Begil* (2005) 128 Cal.App.4th 639, 642 ["Matters presenting pure questions of law, not involving the resolution of disputed facts, are subject to de novo review."].)

" 'In juvenile dependency proceedings, due process requires parents be given notice that is reasonably calculated to advise them an action is pending and afford them an opportunity to defend.' [Citation.]" (*Mia M.*, *supra*, 75 Cal.App.5th at p. 807.) " 'There is no due process violation where a child welfare services agency has exercised reasonable diligence to provide notice to a parent whose whereabouts are unknown. [Citation.] On this score, reasonable diligence "denotes a thorough, systematic investigation and an inquiry conducted in good faith." [Citation.] It includes searching not only "standard avenues available to help locate a missing parent," but " 'specific ones most likely under the unique facts known to the [agency], to yield [a parent's] address.' " [Citations.]' [Citation.]" (*Id.* at pp. 807–808.) Put

---

[24] The parties' failure to address this issue does not bar us from determining the proper standard of review. (See *People v. Taylor* (1992) 6 Cal.App.4th 1084, 1090 & fn. 5 (*Taylor*) [holding that the court could determine the correct standard of review without first requesting supplemental briefing thereon because, even though the parties had failed to "tackle[ ] that issue" in their appellate briefing, "[t]hey certainly had the opportunity" to address that question as it "is present in *every* case"].)

differently, "[s]ocial services agencies, invested with a public trust and acting as temporary custodians of dependent minors, are bound by law to make every reasonable effort in attempting to inform parents of all hearings. They must leave no stone unturned." (*DeJohn B.*, *supra*, 84 Cal.App.4th at p. 102.)

Because DCFS asserted that mother's whereabouts were unknown, the agency bore the burden of documenting its attempts to locate mother and serve her.[25] As we explain below, DCFS's records do not show that the agency exercised reasonable diligence in this endeavor.[26]

---

[25] (See § 294, subd. (f)(7) ["Notice to the parents [of the section 366.26 hearing] may be given in any one of the following manners: [¶] . . . [¶] If a parent's identity is known but his or her whereabouts are unknown and the parent cannot, with reasonable diligence, be served [at the hearing at which the section 366.26 hearing was scheduled or via mail or personal or electronic service], the petitioner shall file an affidavit with the court at least 75 days before the hearing date, stating the name of the parent and describing the efforts made to locate and serve the parent."].)

[26] Although the juvenile court's ruling that mother was given proper notice of the section 366.26 hearing is the only finding that is subject to this appeal (see Discussion, part E, *post*), we also consider whether DCFS provided mother with proper notice of prior hearings because that issue is relevant to our analysis of whether: (1) rule 5.725(a) confers upon father standing to maintain this appeal; and (2) DCFS's violation of mother's right to due process was prejudicial. (See Discussion, part A.2, *ante*; Discussion, part C, *post*.) Absent from DCFS's briefing is any argument that we cannot examine its prior efforts to provide notice to mother for those limited purposes. (See *D.N.*, *supra*, 56 Cal.App.5th at p. 767 [" ' "Although it is the appellant's

29

Father informed the agency prior to the detention hearing that mother resided in El Salvador, but father told the court at the hearing that he did not have her contact information. Similarly, prior to the jurisdiction and disposition hearing, J.R. told DCFS that his mother lived in El Salvador and that he did not have any contact information for her.

The declaration of due diligence accompanying the jurisdiction/disposition report provides no indication that DCFS contacted the El Salvadoran government in order to locate mother.[27] Rather, the agency reviewed federal records and databases concerning persons in California. (See Factual & Procedural Background, part 2, *ante*.) Although we acknowledge that the name for mother that father initially provided to the

---

task to show error, there is a corresponding obligation on the part of the respondent to aid the appellate court in sustaining the judgment. '[I]t is as much the duty of the respondent to assist the [appellate] court upon the appeal as it is to properly present a case in the first instance, in the court below.' " ' "].)

[27] In support of our conclusion that DCFS could have contacted El Salvadoran government officials, we, sua sponte, take judicial notice of a County of Los Angeles webpage that (a) shows the consulate general of El Salvador is located in the county, and (b) provides the consulate's telephone and facsimile numbers. (See *Consulate General of El Salvador* https://locator.lacounty.gov/lac/Location/3176563/consulate-general-of-el-salvador (as of Aug. 12, 2022), archived at https://perma.cc/CH4Y-PR4A; Evid. Code, §§ 452, subd. (c), 459; cf. *Placerville Historic Preservation League v. Judicial Council of California* (2017) 16 Cal.App.5th 187, 191, fn. 1 [taking judicial notice of certain geographic and demographic facts supplied by a county's official website].)

agency turned out to be partially incorrect,[28] that fact does not establish that discussing the matter with El Salvadoran officials would have been futile. The birth certificate for J.R. that DCFS later acquired provides mother's correct name and shows that J.R. was born in El Salvador. The contents of this birth certificate suggest that had DCFS contacted El Salvadoran government personnel at the outset of the proceedings, those officials may have been able to retrieve this record and used it to identify correctly mother for DCFS. El Salvadoran officials then could have attempted to locate mother and place her in contact with the agency. Thus, DCFS's failure to enlist the assistance of this foreign government is inconsistent with DCFS's duty to "leave no stone unturned."[29]

At no point thereafter did DCFS cure this constitutional defect. The agency's status review reports for the hearings held pursuant to section 366.21, subdivisions (e) and (f) do not show that the agency made any further attempts to locate mother before she contacted DCFS on September 18, 2020, nor does DCFS assert it undertook any such efforts. Furthermore, DCFS's records of the September 18, 2020 telephone call provide no

---

[28] Although father provided DCFS with the correct first and middle names for mother, the two surnames he supplied were inaccurate.

[29] (*DeJohn B., supra*, 84 Cal.App.4th at p. 102; cf. *In re Daniel F.* (2021) 64 Cal.App.5th 701, 705, 713 (*Daniel F.*) [criticizing a child welfare agency's failure to "contact[ ] the Mexican consulate or the Mexican social services agency . . . for assistance to locate or serve Father" after mother and several other relatives told the agency that father lived in Mexico; the agency instead searched "databases of records for California and Alameda County"].)

indication that the agency informed her of the nature of the pending dependency proceedings, including the fact that the juvenile court could ultimately extinguish her parental rights.[30] It follows that the agency did not provide mother with constitutionally adequate notice at that time. (See *Mia M.*, *supra*, 75 Cal.App.5th at p. 807 [" ' "[Due process requires that the] parent [be] advised of the *nature* of the hearing giving rise to th[e] opportunity [to be heard], including what will be decided therein. Only with adequate advisement can one choose to appear or not, to prepare or not, and to defend or not." ' "].)

Also, during the September 18, 2020 telephone call, mother gave the social worker her cellular telephone number and her home address in El Salvador. Although DCFS's records of the September 18, 2020 call do not clarify whether mother stated she was in Guatemala or in El Salvador at that time,[31] this social worker had an opportunity to eliminate any uncertainty by asking mother for her current residence, or DCFS could have later attempted to resolve any lingering ambiguity by calling the cellular telephone number that mother had provided. In

---

[30] (See also *Christopher L.*, *supra*, 12 Cal.5th at p. 1076 [" ' "Once reunification services are ordered terminated [by the juvenile court], the focus shifts to the needs of the child for permanency and stability." ' ". . . . " '[T]he court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child.' "].)

[31] For instance, while the October 20, 2020 last minute information report states mother "reported that she was *currently* 'stuck in Guatemala for about a year now[,]' " it also states that "[m]other *sells* cell phones in El Salvador." (Italics added.)

32

addition, DCFS reported that on January 25, 2021, J.R.'s foster caregiver disclosed that her sister was able to contact mother through social media. Thus, the agency had been presented with yet another potential avenue for obtaining mother's then-current contact information. (See *Mia M.*, *supra*, 75 Cal.App.5th at p. 809 [noting that a child welfare agency may use social media to obtain contact information and thereafter properly notify a parent].) Nevertheless, entirely absent from the record is any evidence that DCFS attempted to give mother notice of the next status review hearing, which was held on February 25, 2021.

In advance of the section 366.26 hearing, DCFS once again failed to contact mother via telephone, mail, or social media. Rather, upon confirming that mother's location could not be found in the databases the agency had reviewed prior to the jurisdiction/disposition hearing, DCFS served mother by publishing a notice of the forthcoming hearing in a Los Angeles-based newspaper of general circulation in California. (See Factual & Procedural Background, part 6, *ante*.) In light of DCFS's awareness that mother was in either El Salvador or Guatemala when it last heard from her, we find that publication in a Los Angeles-based newspaper did not give her " 'notice that [was] reasonably calculated to advise [her] an action [was] pending and afford [her] an opportunity to defend' " against the termination of her rights. (See *Mia M.*, *supra*, 75 Cal.App.5th at p. 807; see also *id.* at pp. 808–809 [noting that service by publication will not satisfy due process if it is not the " 'most likely means of . . . notify[ing]' " the parent].) This is particularly so given that DCFS had far better methods of contacting mother, including dialing the telephone number she had provided to them.

For the foregoing reasons, we conclude that DCFS failed to exercise reasonable diligence in attempting to locate and serve mother with notice of the dependency proceedings.  The agency thus deprived mother of her constitutional right to due process of law.

## C.    DCFS's Violation of Mother's Right to Due Process Was Prejudicial

The parties dispute whether DCFS's failure to provide mother with proper notice of the proceedings is per se reversible as structural error or subject to a harmless error analysis.  We need not resolve this issue because, as discussed below, even if arguendo this due process violation were subject to a harmless error analysis, that analysis would require reversal of the order terminating parental rights.

The *Chapman*[32] standard of prejudice governs our review of whether DCFS's violation of mother's due process rights compels reversal.[33]  (See *In re Angela C.* (2002) 99 Cal.App.4th

---

[32]  (*Chapman v. California* (1967) 386 U.S. 18.)

[33]  DCFS argues that because "there was no error of a constitutional dimension[, r]eversal is not warranted . . . unless it is reasonably probable the parent would have achieved a more favorable result in the absence of the error."  We reject that contention for the reasons provided in Discussion, part B, *ante*.

Additionally, DCFS intimates that certain "courts will not reverse" based on an alleged due process violation "absent a reasonable probability the parent would have achieved a more favorable outcome but for the error."  Neither decision DCFS cites supports that proposition.  (See *In re Jesusa V.* (2004) 32 Cal.4th 588, 625–626 [applying the reasonable probability standard to a

389, 391; *id.* at p. 394 ["In determining the effect of 'most constitutional errors,' appellate courts can properly apply a *Chapman* harmless error analysis."]; *Christopher L.*, *supra*, 12 Cal.5th at p. 1073 [same]; *Mia M.*, *supra*, 75 Cal.App.5th at p. 806 ["An error in attempted notice is subject to a harmless beyond a reasonable doubt standard of prejudice."].)  " 'The beyond-a-reasonable-doubt standard of *Chapman* "requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the [adverse ruling]."  [Citation.] . . . [Citation.]' . . . [Citation.]" (See *People v. Pearson* (2013) 56 Cal.4th 393, 463, third bracketed insertion added.)

DCFS fails to discharge its burden of showing that the infringement of mother's right to due process was harmless beyond a reasonable doubt.  DCFS asserts that mother "would likely not have participated at the section 366.26 hearing" because "the evidence establishes mother knew that [J.R.] was in

claim that the juvenile court violated a statute by adjudicating a dependency petition in the parent's absence, but rejecting the parent's related due process claim because "one can say with confidence that '[n]o other result was possible' even if he had been present," thereby indicating that the high court subjected the constitutional claim to a different harmless error standard than the statutory claim]; *Daniel F.*, *supra*, 64 Cal.App.5th at pp. 704, 716 [rejecting a child welfare agency's claim of harmless error under the reasonable probability test in an appeal from the denial of a section 388 petition predicated on the child welfare agency's failure to properly notify the father of the proceedings; there is no indication in the opinion that the father sought reversal under the *Chapman* standard]; see also *In re H.E.* (2008) 169 Cal.App.4th 710, 721 [" '[A]n opinion is not authority for a proposition not therein considered.' "].)

35

DCFS's custody, but she chose not to ask for visits with the child and chose not to participate in the dependency proceedings . . . ." The agency further asserts that "even had mother appeared at the section 366.26 hearing, the evidence establishes that she would not have obtained a more favorable outcome [at] that hearing," given that "[t]he only way for mother to avoid termination of her parental rights would be to establish the beneficial-relationship exception," which required her to show she "maintained regular visitation and contact with the child."

We agree with DCFS that "[t]he evidence shows that at least since September 18, 2020, mother was aware that [J.R.] was in the custody of [the agency] as she called the social worker." Yet, there is no indication in DCFS's records of the September 18, 2020 telephone conversation that the social worker informed mother that she could request visits with J.R. or otherwise participate in the dependency proceedings. Thus, DCFS has failed to show beyond a reasonable doubt that if the agency had afforded mother constitutionally sufficient notice of the section 366.26 hearing, she would have failed to appear. Additionally, mother's statement to DCFS that she "want[ed J.R.] returned to her" belies the agency's claim that mother would have been unwilling to make an appearance.

DCFS also fails to demonstrate that had mother appeared at the section 366.26 hearing, the juvenile court still would have terminated her parental rights. In focusing solely on section 366.26, subdivision (c)(1)(B)(i)'s beneficial-relationship exception, DCFS overlooks the fact that mother could have prevented the juvenile court from terminating her parental rights by filing a section 388 petition contesting the validity of its prior

36

orders barring her from reunifying with J.R.[34]  Mother also could have asked the juvenile court to exercise its authority to "change, modify, or set aside" these prior rulings sua sponte.[35]

Given our conclusion that DCFS failed to provide mother with constitutionally adequate notice of the proceedings (see Discussion, part B, *ante*) and the agency's failure to address whether the court would have vacated its previous rulings on that basis, we cannot conclude beyond a reasonable doubt that mother's appearance at the section 366.26 hearing would have

---

[34]  (See *Mia M.*, *supra*, 75 Cal.App.5th at p. 807 [" 'A section 388 petition is the appropriate method for raising a due process challenge based on lack of notice.' "]; *id.* at pp. 795–796 ["Seeking a new jurisdiction and disposition hearing," father "filed a petition under . . . section 388 . . . .  [¶] Finding prejudicial error, we reverse the court's order denying father's section 388 petition and vacate the order terminating parental rights as to [the child]."]; *Christopher L.*, *supra*, 12 Cal.5th at pp. 1079–1080 ["[T]he statutory scheme provides a mechanism for reconsideration of the court's prior orders . . . .  Section 388 authorizes a parent . . . to petition the juvenile court 'to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court.' "].)

[35]  (See *Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 98–99, fn. omitted; see also *In re Marriage of Spector* (2018) 24 Cal.App.5th 201, 215 [" 'If a court believes one of its prior interim orders was erroneous, it should be able to correct that error no matter how it came to acquire that belief.' "].)

been futile.  Thus, DCFS's contravention of mother's fundamental right to due process was prejudicial.[36]

## D.    We Conditionally Reverse the Order Terminating Mother's and Father's Parental Rights

We now turn to deciding the proper disposition, which we conclude is a conditional reversal of the order terminating parental rights.[37]  We find instructive cases in which the juvenile court has terminated parental rights, but the appellate court has concluded there was prejudicial error in failing to afford proper notice to an Indian tribe as required by the Indian Child Welfare Act of 1978 (ICWA, 25 U.S.C. § 1901 et seq.).  Upon invalidating a termination order based solely on an ICWA notice error, a

_____

[36] Father further contends that DCFS failed to comply with certain statutory provisions governing the proper method of service in dependency proceedings.  We acknowledge that "[c]ourts generally should avoid resolving constitutional issues if a case can be decided on statutory grounds." (*Citizens to Save California v. California Fair Political Practices Com.* (2006) 145 Cal.App.4th 736, 745.)  Nevertheless, we exercise our discretion to reach the constitutional claim because (a) of the importance of the due process violation in question, and (b) it is unclear whether resolving father's statutory claim would allow us to avoid deciding the constitutional issue, given that errors of state law "generally do[ ] not warrant reversal unless there is a reasonable probability that in the absence of the error[s], a result more favorable to the appealing party would have been reached.' [Citation.]" (See *Christopher L.*, *supra*, 12 Cal.5th at p. 1073.)

[37] Because the proper scope of reversal is a question presented in every appeal, the parties' failure to explicitly address this issue does not prevent us from resolving it.  (Cf. *Taylor*, *supra*, 6 Cal.App.4th at p. 1090 & fn. 5.)

Court of Appeal can issue a conditional reversal, to wit, a reversal of the order with instructions to reinstate it "if no Indian tribe intervenes after proper notice is given." (See *In re Francisco W.* (2006) 139 Cal.App.4th 695, 699, 702–704, 706, 711 (*Francisco W.*) [referring to this disposition as a "limited reversal"]; *In re A.W.* (2019) 38 Cal.App.5th 655, 659, 667–668 [utilizing the alternative term "conditional[ ] reversal[ ]" to identify this disposition].)

Just as an Indian tribe may decline to intervene upon receiving notice that complies with ICWA, mother could choose not to appear after DCFS cures the violation of her right to due process. Should that occur, then allowing father to relitigate whether his parental rights should have been terminated would undermine J.R.'s interest in obtaining " '[a] stable, permanent placement, and [a] full emotional commitment, as promptly as reasonably possible . . . .' [Citation.]" (See *Francisco W.*, *supra*, 139 Cal.App.4th at p. 706.) Accordingly, we conclude that the order terminating parental rights should be reinstated if mother does not appear after being afforded proper notice and a reasonable opportunity to be heard.[38] (See *CREED-21 v. City of San Diego* (2015) 234 Cal.App.4th 488, 517 [" ' "[R]easonable notice and a reasonable opportunity to be heard . . . is all that is required [for due process]." ' "].)

_____

[38] If any "postjudgment change of circumstances affecting [J.R.'s] adoptability" arise, our conditional reversal would not necessarily preclude the juvenile court from revisiting the order terminating parental rights. (See *Francisco W.*, *supra*, 139 Cal.App.4th at pp. 709–710 [finding that section 366.26, subdivision (i)(2) provides a mechanism by which *a child* may request the reinstatement of parental rights].)

**E.     Because Father Did Not Timely Appeal the Jurisdictional and Dispositional Orders, Those Orders Are Beyond the Scope of This Appeal**

In his opening brief, father argues that "[r]eversal for lack of notice would void not only the judgement terminating parental rights, but also the jurisdiction and disposition orders," and he asks us to instruct the juvenile court to "conduct new properly noticed jurisdictional and dispositional hearings as to mother . . . ."  In response, DCFS contends that father may not challenge the juvenile court's prior jurisdictional and dispositional orders because he did not timely appeal from those rulings.  Father counters in his reply that *DeJohn B.* and *Mia M.* support his request for new jurisdictional and dispositional hearings for mother.

Our review of the juvenile court's docket confirms that father did not appeal the jurisdictional and dispositional rulings issued on September 10, 2019.  Furthermore, the 60-day deadline for appealing these prior rulings expired long ago.  (See rule 8.406(a)(1).)  Therefore, the jurisdictional and dispositional orders are not properly before us.  (See *Sara M.*, *supra*, 36 Cal.4th at p. 1018; see also *In re Athena P.* (2002) 103 Cal.App.4th 617, 624 [" ' "The first appealable order in the dependency process is the dispositional order.  [Citation.]" ' [Citation.] . . .  [A]ny challenge to the jurisdictional findings would have to be raised in an appeal from the dispositional order."].)

Additionally, father's resort to *DeJohn B.* and *Mia M.* on this point is unavailing.  In each case, the juvenile court had denied a parent's section 388 petition to set aside prior rulings for lack of proper notice.  (See *DeJohn B.*, *supra*, 84 Cal.App.4th at pp. 105–106; *Mia M.*, *supra*, 75 Cal.App.5th at pp. 795–796.)

40

Because a section 388 petition is an appropriate vehicle to challenge prior orders (see Discussion, part C, *ante*), an appellate court reviewing an order denying a section 388 petition is empowered to grant the relief sought therein, i.e., setting aside those prior rulings. (See Code Civ. Proc., § 43 [providing that a reviewing court "may affirm, reverse, or modify any judgment or order appealed from, and may direct the proper judgment or order to be entered"]; *id.*, § 906 [same].) As we explained earlier in this part, only the order terminating mother's and father's parental rights is properly before us, and reversing that order does not, in and of itself, invalidate the juvenile court's prior jurisdictional and dispositional rulings.

## DISPOSITION

We deny plaintiff and respondent Los Angeles County Department of Children and Family Service's (DCFS's) motion to dismiss this appeal.  The August 25, 2021 order terminating parental rights is conditionally reversed, and the matter is remanded to the juvenile court with instructions to order DCFS to exercise reasonable diligence as described in this opinion in attempting to locate and serve mother with proper notice of the dependency proceedings.  If mother fails to appear in the proceedings within a reasonable period of time after DCFS has discharged this obligation, then the juvenile court shall reinstate its order terminating parental rights as to mother and father.  If mother makes an appearance within a reasonable period of time after proper service is effected, then the juvenile court shall undertake further proceedings consistent with this opinion.

CERTIFIED FOR PUBLICATION.


BENDIX, J.


We concur:



ROTHSCHILD, P. J.



CHANEY, J.

42